**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In the Matter of M.G.E. and A.F.E.      )
                                       )

JOSEPH MARCEL ETIENNE JEAN POIX   )
                                       )

         Petitioner,         )
                                       )

vs.                                   )        No. 22-cv-4980
                                       )

SUSIBEL ALTAGRACIA ESPAILLAT SANTANA  )
                                       )

         Respondent.        )
_____)


## PETITIONER'S PRE-TRIAL MEMORANDUM OF LAW


 

                              GREEN KAMINER MIN & ROCKMORE LLP
                              420 Lexington Avenue, Ste. 2821
                              New York, New York 10170
                              Tel.: (212) 681-6400
                              Fax: (212) 681-6999

                              _Attorneys for Petitioner_


Dated: August 10, 2022

## <u>TABLE OF CONTENTS</u>

**Page(s)**

TABLE OF AUTHORITIES………..………………………………..…………………..…... ii - v

PETITIONER'S PRETRIAL BRIEF ………….................................................................................1

I.    Background Facts ..................................................................................2

II.   Legal Framework and the Requirements for
      Return of Children Under the Hague Convention ...........................................3

      A.  The Dominican Republic is the
          Children's Habitual Residence……………...……………………….........6

      B.  The Wrongful Removal was in Breach
          of Mr. Etienne's Rights of Custody………….………….................................7

      C.  Mr. Etienne Was Exercising His Rights of Custody
          At the Time of the Wrongful Removal and Retention ………..……………11

III.  Ms. Espaillat's Grave Risk of Harm Defense is Not Sustainable………………………13

      A.  Evidentiary Standard ………………………………………….....................14

      B.  Ms. Espaillat's Claims of Domestic Abuse Fail
          to Establish Grave Risk of Harm to the Children………………………….15

IV.   Conclusion…..………………………………………………………………19

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                           **Page(s)**

*Abbott v. Abbott*
    560 U.S. 1 (2010)……………………………………………………………………4,8.13

*Acosta v. Acosta*
    725 F.3d 868 (8th Cir. 2013)……………………………………….……………13

*Antunez-Fernandes v. Connors- Fernandes*
    259 F.Supp.2d 800 (N.D. Iowa 2003)…………...………………………………13,14

*Babcock v. Babcock*
    503 F.Supp.3d 862 (S.D. Iowa 2020)…………………………..……………………...13

*Baran v. Beaty*
    526 F.3d 1340 (11th Cir. 2008)………………………………..………………15

*Basil v. Ibis Aida de Teresa Sosa,*
    2007 WL 2264599  (M.D. Fla. Aug. 6, 2007)………………………………..………17

*Baxter v. Baxter*
    423 F.3d 363 (3d. Cir 2005)……………………………………………...……12

*Blondin v. Dubois*
    189 F.3d 240 (2d Cir. 1999)………………………………………………………5

*Elyashiv* v. *Elyashiv*
    353 F. Supp. 2d 394 (E.D.N.Y. 2005)………………………………….………5

*Ermini v. Vittori*
    758 F.3d 153 (2d Cir. 2014)……………………………………………….…..11

*Feder v. Evans Feder*
    63 F.3d 217 (3d Cir. 1995)……………………………………………….……7

*Forcelli v. Smith*
    2020 WL 5015838 *1 (D. Minn. Aug. 25, 2020)………………………………………14

*Friedrich v. Friedrich*
    78 F.3d 1060 (6th Cir. 1996) …………………………………..………………...14

*Furnes v. Reeves*
    362 F.3d 702 (11th Cit 2004),
    abrogated on other grounds by,

*Lozano v. Montoya Alvarez*
    572 U.S. 1 (2014).............................................................................9

*Gitter v. Gitter*
    396 F.3d 124 (2d Cir. 2005) .............................................................9

*Golan v. Saada*
    142 S.Ct. 1880 (2022)......................................................................5

*Gomez v. Fuenmayor*
    812 F.3d 1005, 1012 (11th Cir. 2016)................................................17

*Hanley v. Roy*
    485 F.3d 641 (11th Cir. 2007)............................................................8

*Ibarra v. Quintanilla Garcia*
    476 F. Supp. 2d 630, 636 (S.D. Tex. 2007).........................................17

*In re Application of Adan*
    437 F.3d 381 (3d Cir. 2006)..............................................................12

*In re Krishna* v. *Krishna*
    1997 WL 195439 *1 (N.D. Cal. Apr. 11, 1997)....................................12

*In re Lozano*
    809 F. Supp. 2d 197 (S.D.N.Y. 2011),
    *aff'd sub nom Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012),
    *aff'd sub nom Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014) ................4

*Monasky v. Taglieri*
    140 S.Ct. 719 (2020) .................................................................4,6,7

*Moreno v. Basilio Pena*
    2015 WL 4992005 *1 (S.D.N.Y. Aug. 19, 2015)...................................9

*Mota v. Castillo*
    692 F.3d 108 (2d Cir. 2012)..........................................................3,4,7

*Mozez v. Mozez*
    239 F.3d 1067 (9th Cir. 2001).......................................................6,7

*Norden–Powers v. Beveridge*
    125 F.Supp.2d 634 (E.D.N.Y. 2000)...............................................7,15

*Nunez-Escudero v. Tice-Menley*
    58 F.3d 374 (8th Cir. 1995).........................................................13,14

*Oliver A.* v. *Diana Pina B.*
    151 A.D.3d 485 (N.Y. App. Div. 2017)…………………..………………………...15

*Ragbir* v. *Holder*
    389 F. App'x 80 (2d Cir. 2010)…………………………………………………….15

*Silverman v. Silverman*
    338 F.3d 886 (8th Cir. 2003)…………………………………………………….13

*Souratgar v. Lee*
    720 F.3d 96 (2d Cir. 2013) …………………………...………………………4,15,16,18

*Tsai-Yi Yang v. Fu-Chiang Tsui*
    499 F.3d 259 (3d Cir. 2007)……………………………..………………………7,12

*Van De Sande v. Van De Sande*
    431 F.3d 567 (7th Cir. 2005)…………………………………………………….15

*Vasquez v. Colores*
    648 F.3d 648 (8th Cir. 2011)…………………………...……………………..13,14

*Walsh v. Walsh*
    221 F.3d 204 (1st Cir. 2000)………………………………………….………….13

*Whallon v. Lynn*
    230 F.3d 450 (1st Cir. 2000)……………………………………….……….8,14,16

**Statutes**

22 U.S.C. § 9001 …….…...…………………………………………………….………….1

22 U.S.C. § 9001(b)(4) …...…………………………………………………………….4

22 U.S.C. § 9003(e)(1)…………………………………………………………...5,11

22 U.S.C. § 9003(e)(2)(A) …………………………………………………….13,14

Hague Convention, art. 3 ...……………………………………………………..6,7

Hague Convention, art. 5(a) ...…………………………………………………….7,8

Hague Convention, art. 13(a) ...……………………………………………………5

Hague Convention, art. 13(b) ...………………………………………..5,13,16,18

Hague Convention, Preamble
        51 Fed. Reg. 10494 (March 26, 1986) ……………………………………………………3


**Foreign Statutes**

Decree 631-11, Regulation for the Application of the General
Immigration Law, No. 285-04, art. 124 (Aug. 15, 2004) ………………………………….………10

Code for System Protection and Fundamental
Rights of Boys, Girls, and Adolescents, art. 8 ……...................................................................10

Code for System Protection and Fundamental
Rights of Boys, Girls, and Adolescents, art. 67…….................................................................10

Code for System Protection and Fundamental
Rights of Boys, Girls, and Adolescents, art. 72…….................................................................10

Code for System Protection and Fundamental
Rights of Boys, Girls, and Adolescents, art. 97 ……................................................................10

Code for System Protection and Fundamental
Rights of Boys, Girls, and Adolescents, art. 204 ……..............................................................10


**Other Sources**

Black's Law Dictionary 636 (9th ed. 2009)…………………………………………...…………15

Elisa Perez-Vera, Explanatory Report: Hague Conference on
Private International Law 67, in 3 Acts and Documents of
the Fourteenth Session 426……………………………………………………………………8,15

Paul R. Beaumont & Peter E. McEleavy
*The Hague Convention on International Child Abduction* 51 (Oxford University Press 1999)……9

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

In the Matter of M.G.E. and A.F.E.     )
     )
JOSEPH MARCEL ETIENNE JEAN POIX     )
     )
     Petitioner,     )
     )
vs.     )     No. 22-cv-4980
     )
SUSIBEL ALTAGRACIA ESPAILLAT SANTANA     )
     )
     Respondent.     )
_____)

## PETITIONER'S PRETRIAL BRIEF

On or about August 22, 2021, Respondent, Susibel Altagracia Espaillat Santana (hereinafter "Ms. Espaillat" or "Mother") wrongfully removed the parties' two (2) children, M.G.E. (age six) and A.F.E. (age four) (collectively, the "Children"), from their habitual residence in the Dominican Republic to New York, without the consent or knowledge of Petitioner, Joseph Marcel Etienne Jean Poix (hereinafter "Mr. Etienne" or "Father"). To date, Ms. Espaillat is still wrongfully retaining the Children in New York. On November 11, 2021, Mr. Etienne filed a petition in this Court under the Hague Convention on the Civil Aspects of Child Abduction, Oct. 25, 1980, art. 13(b), T.I.A.S. No 11670, 1343 U.N.T.S. 89, reprinted in 51 Fed. Reg., 10, 494 (Mar. 26, 1986) ("Hague Convention"), implemented in the United States through the International Child Abduction Remedies Act, 22 U.S.C. § 9001 et seq. (formerly codified at 42 U.S.C. § 11601 et seq.) ("ICARA"), seeking return of the Children to the Dominican Republic (the "Petition"). ECF No. 1.

## I.     <u>BACKGROUND FACTS</u>

Mr. Etienne, a dual citizen of the Dominican Republic and Haiti, and Ms. Espaillat, a citizen of the Dominican Republic, were married in Santiago, Dominican Republic in 2014.  The parties' Children, M.G.E. and A.F.E., were born in the United States in 2016 and 2017, respectively.  Each child remained in the United States until they were one (1) month old, following their births.  Thereafter, Ms. Espaillat returned to the Dominican Republic with each child.

The parties' relationship began deteriorating in 2020, and by the end of 2020, Mr. Etienne and Ms. Espaillat divorced.  The parties' divorce judgment granted Ms. Espaillat provisional custody of the Children, pending further determination of final custody and visitation arrangements.  Ms. Espaillat was not granted any right to relocate with the Children to the United States, and pursuant to Dominican law, she was required to have Mr. Etienne's written consent to travel with the Children out of the Dominican Republic.  Following the entry of the divorce judgment, the parties mutually agreed that Mr. Etienne would spend each weekend and certain weekdays with the Children.

In 2021, Ms. Espaillat moved from Santo Domingo, Dominican Republic to Santiago, Dominican Republic with the Children.  Although Mr. Etienne resided in Santo Domingo and Santiago was a long distance away from his home in Santo Domingo, he maintained his parenting schedule.  Ms. Espaillat complied with the mutually agreed upon parenting schedule until the weekend of June 26, 2021.  Thereafter, Ms. Espaillat withheld the Children from Mr. Etienne.  The weekend of June 26, 2021 was the last time that Mr. Etienne saw the Children in person.

On or around August 22, 2021, Ms. Espaillat boarded a late-night flight with the Children from Santiago to New York, without Mr. Etienne's knowledge or consent. Ms. Espaillat has wrongfully retained the Children in New York ever since.

On or around November 10, 2021, Mr. Etienne filed a "Request for Return" and application ("Hague Application") with the National Council for the Childhood Adolescence in the Dominican Republic, requesting the return of the Children to their habitual residence in the Dominican Republic.  Subsequently, the United States Department of State sent a letter to Ms. Espaillat, notifying her of Mr. Etienne's Hague Application.  Ms. Espaillat refused to voluntarily return the Children to their habitual residence and instead, gave Mr. Etienne a phone number where the Children could be reached, only during afternoons on the weekends.

To date, the Children remain in New York with Ms. Espaillat.  Ms. Espaillat has repeatedly indicated that she does not intend to return the Children to their habitual residence in the Dominican Republic.  By absconding with the Children to New York, Ms. Espaillat has wrongfully prevented Mr. Etienne from exercising his legally recognized rights of custody over the Children. Ms. Espaillat does not have any valid defenses under the Hague Convention that would justify her wrongful removal of the Children from the Dominican Republic and wrongful retention of the Children in New York.  Thus, the Children should be immediately repatriated to their habitual residence in the Dominican Republic.

## II.    LEGAL FRAMEWORK AND THE REQUIREMENTS FOR RETURN OF CHILDREN UNDER THE HAGUE CONVENTION

The Hague Convention was adopted in 1980 "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  Hague Convention, Preamble; 51 Fed. Reg. 10494, 10498 (March 26, 1986).  "The Convention's drafters were particularly concerned by the practice in which a family member would remove a child to jurisdictions more favorable to his or her custody claims in order to obtain a right of custody from the authorities of the country to which the child had been taken."  *Mota v.*

*Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (internal quotation marks and brackets omitted); *accord Abbott v. Abbott*, 560 U.S. 1, 8 (2010) (stating that Convention was adopted "in response to the problem of international child abductions during domestic disputes"); *see also Friedrich v. Friedrich,* 78 F.3d 1060, 1064 (6th Cir. 1996). ("The Hague Convention is also meant to deter parents from crossing borders in search of more favorable forums.")

The Hague Convention "ordinarily requires the prompt return of a child wrongfully removed or retained away from the country in which she habitually resides." *Monasky v. Taglieri*, 140 S.Ct. 719, 723 (2020). Accordingly, "[t]he Convention's remedy of repatriation is designed to preserve the status quo in the child's country of habitual residence and deter parents from crossing international boundaries in search of a more sympathetic court." *Souratgar v. Lee*, 720 F.3d 96, 102 (2d Cir. 2013) (internal quotation marks omitted). In the instant case the Children's status quo was undoubtedly living in the Dominican Republic until they were wrongfully removed to the United States and retained in New York.

"The Convention does not establish substantive standards for resolving the merits of any underlying custody dispute. Rather, the Hague Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings." *Mota*, 692 F.3d at 112; *see* 22 U.S.C. § 9001(b)(4) (providing that a court may only determine rights under the Hague Convention, not the merits of custody disputes). In other words, "the focus of a court's inquiry in a Hague Convention case is not 'the best interests of the child,' as it typically is in a state custody case; rather it is the specific claims and defenses under the Convention." *In re Lozano*, 809 F. Supp. 2d 197, 217 (S.D.N.Y. 2011) (internal quotation marks omitted), *aff'd sub nom. Lozano v. Alvarez*, 697 F.3d 41 (2d Cir. 2012), *aff'd sub nom. Lozano v. Montoya Alvarez*, 572 U.S. 1 (2014).

To prevail on a claim under the Hague Convention, a petitioner must show by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005); *see also* 22 U.S.C. § 9003(e)(1) (setting forth petitioner's burden). "[O]nce a [petitioner] establishes that removal was wrongful, the child *must be returned* unless the respondent can establish one of four defenses." *Blondin v. Dubois*, 189 F.3d 240, 244-45 (2d Cir. 1999) ("*Blondin II*") (emphasis in original).

In the instant proceeding, Ms. Espaillat has proffered two (2) defenses in seeking to preclude the repatriation of the Children to the Dominican Republic. The first affirmative defense that Ms. Espaillat raises is the grave risk of harm defense. Hague Convention, art. 13(b); *see* ECF No. 15, ¶ 16. Mr. Etienne denies any and all allegations of abuse. However, Ms. Espaillat's allegations supporting this defense are thin and do not rise to the level necessary to support the grave risk defense, even if they were true. The second affirmative defense asserted by Ms. Espaillat is that Mr. Etienne "withdrew" from his responsibility of care as the father of the Children. *See* Hague Convention, art. 13(a); *see* ECF No. 15, ¶ 33. This is also untrue, seeing as Mr. Etienne has always been actively involved in the Children's lives and has suffered emotionally as a result of not seeing the Children for over one (1) year. As detailed below, these arguments are insufficient to defeat the Mr. Etienne's prima facie case, and the Children should be returned to the Dominican Republic.

### A.    <u>The Dominican Republic is the Children's Habitual Residence</u>

Ms. Espaillat challenges the fact that the Children's habitual residence is the Dominican Republic, despite that the Children's home at the time of her wrongful removal and retention in August 2021 was the Dominican Republic.  *See Monasky*, 140 S.Ct. at 726; Hague Convention, art. 3(a) (limiting this inquiry to where "the child was habitually resident immediately before the removal or retention").  However, if the Court were to conduct an independent inquiry into the Children's habitual residence, the Court would conclude that the Children's habitual residence was and remains the Dominican Republic.

Generally, "[t]he place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Id*.  "Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.* at 723.  Courts determine the habitual residence of a child based on the totality of the circumstances. *Id.*  Although "[t]he Hague Convention does not define the term 'habitual residence'," a "child 'resides' where she lives." *Id.* at 726.  A child's residence becomes habitual when "her residence there is more than transitory," when it is where "the family and social environment in which the child's life has developed," and when there is "some degree of integration by the child in a social and family environment." *Id.* (internal citations and quotations omitted).

In acquiring a new habitual residence, there must be a settled intention by the parents to abandon their prior habitual residence.  *See Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001).  At the same time, "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Id.* at 727. Where a child has spent most of their life in one country, even if they have become relatively adjusted and acclimated in the removed-to country, courts will often find the

habitual residence to be the country where the child has been "physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." *Feder v. Evans-Feder,* 63 F.3d 217, 224 (3d Cir. 1995). The Circuits are in agreement that when a child has lived nearly their entire life exclusively in one country, that country is the child's habitual residence. *See Mozes v. Mozes,* 239 F.3d 1067, 1075 (9th Cir. 2001); *see also Mota v. Castillo,* 692 F.3d at 114; *see also* Hollis v. O'Driscoll, 739 F.3d 108, 113 (2d Cir. 2014); *see also Tsai-Yi Yang v. Fu-Chiang Tsui,* 499 F.3d 259, 272 (3d. Cir 2007)*; see also Sorenson v. Sorenson,* 559 F.3d 871, 874 (8th Cir. 2009); *see also Koch v. Koch,* 450 F.3d 703, 719 (7th Cir. 2006); *see also Norinder v. Fuentes,* 657 F.3d 526, 534 (7th Cir. 2011). The Supreme Court agreed in *Monasky* that "[courts] share a 'common' understanding: The place where a child is at home, at the time of removal or retention, ranks as the child's habitual residence." *Monasky,* 140 S. Ct. at 725.

In the instant case, common sense dictates that the Children's habitual residence, having lived in the Dominican Republic for their entire lives, is the Dominican Republic.  There was no shared intent by the parties to relocate the Children to the United States and Mr. Etienne vehemently opposes the Children's continued wrongful retention in New York.

### B.       The Wrongful Removal Was in Breach of Mr. Etienne's Rights of Custody

In order to establish a wrongful removal, a petitioner must show that the children were removed "in breach of rights of custody attributed to" him.  Hague Convention, art. 3.  Under Article 5 of the Hague Convention, custody rights "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence . . . " *Id.* at art. 5(a).  The Hague Convention "provides no further definition of the term 'rights of custody,'" but "courts have commonly looked to the background report of the Convention for further guidance."

*Whallon v. Lynn*, 230 F.3d 450, 455 (1st Cir. 2000).  According to the Perez Vera report, custody rights invoke "the law of the child's habitual residence" and derive from "all [sources] upon which a claim can be based within the context of the legal system concerned."  *Id*. (quoting Elisa Perez-Vera, Explanatory Report: Hague Conference on Private International Law 67, in 3 Acts and Documents of the Fourteenth Session 426, 446).

Thus, the Dominican Republic's law determines Mr. Etienne's rights of custody, but ought to be interpreted "in light of the Convention's basic principle that a child's country of habitual residence is best placed to decide upon questions of custody."  *Id*. at 456.  Rights of custody "may arise . . . by operation of law or by reason of a judicial or administrative decision."  Hague Convention, art. 3.

The Convention "broadly" defines "rights of custody" to include "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Abbott*, 560 U.S. at 9 (quoting Hague Convention, art. 5(a)) (internal quotation marks omitted). Rights of custody arise "by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State." Hague Convention, art. 3. "The intention of the Convention is to protect all the ways in which custody of children can be exercised, and the Convention favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Hanley v. Roy*, 485 F.3d 641, 645 (11th Cir. 2007) (quotations and citations omitted); *see also Abbott*, 560 U.S. at 19.

On the topic of custody rights, the Eleventh Circuit Court of Appeals has stated that:

> [i]n American courts, we tend to think of custody rights primarily in the sense of physical custody of the child. However, in applying the Hague Convention, we must look to the definition of "rights of custody" set forth in the Convention and not allow our somewhat different American concepts of custody to cloud our application of the Convention's terms. Specifically, in this case we must think of

> "rights of custody" as including "rights relating to the care of the
> person of the child," and in particular, "the right to determine the
> child's place of residence."

*Furnes v. Reeves*, 362 F.3d 702, 711 (11th Cir. 2004), abrogated on other grounds by, *Lozano v.*

*Montoya Alvarez*, 572 U.S. 1, 134 S. Ct. 1224, 188 L. Ed. 2d 200 (2014).

Additionally, "[i]t is crucial to note that the violation of a single custody right suffices to

make removal of a child wrongful.  That is, a parent need not have "custody" of the child to be

entitled to return of his child under the Hague Convention; rather, he need only have one right of

custody.  Further, he need not have a sole or even primary right of custody.  *Furnes*, 362 F.3d at

714–15.

In the instant case, Mr. Etienne has rights of custody under the Hague Convention and

ICARA pursuant to the implications of the divorce judgment entered in the Dominican Republic

in December 2020, Dominican civil code, as well as Mr. Etienne's *ne exeat* right to determine the

Children's place of residence.  *See generally Moreno v. Basilio Pena,* 2015 WL 4992005 *1, *7-

*8 (S.D.N.Y. Aug. 19, 2015) (stating that "'[w]hen both parents have parental authority and none

of the causes established [i]n Article 72 of the Code of the Minor—that is, the majority,

emancipation, or death of the child, or the termination of parental authority by a court order—both

parents 'have equal rights over their children'" and stating that under the Dominican Code, because

"a parent may leave the country with his child only if he has the consent of the child's other parent,"

the petitioning parent of a child that is a habitual resident of the Dominican Republic "possesse[s]

a *ne exeat* right concerning [the child's] removal from the Dominican Republic"); *see also* Paul R.

Beaumont & Peter E. McEleavy, *The Hague Convention on International Child Abduction* 51

(Oxford University Press 1999) ("Were temporary orders of this type to be included [under Article

3(2)], a parent could be deprived of the Convention remedy without the merits of the custody issue

having been fully investigated. Therefore, unless an express declaration if made to the contrary, it is submitted that a provisional award of sole custody should not be recognized as allowing a parent to remove a child to . . . a foreign jurisdiction.").

Ms. Espaillat's actions unequivocally breached Mr. Etienne's custody rights. Although the parties' judgment of divorce granted provisional custody of the parties' Children to Ms. Espaillat, Mr. Etienne's rights of custody to the Children remain intact under the applicable laws of the Dominican Republic. ECF No. 29-1; *see also* ECF No. 39. Pursuant to Article 67 of the Code for System Protection and Fundamental Rights of Boys, Girls, and Adolescents ("Law 136-03"), "[p]arental authority is the set of rights and duties that belong equally to the father and mother, in relation to the sons and daughters who have not attained age of majority." *Id.* Absent termination of parental authority under Article 72 of Law 136-06 (by "(a) age of majority of the adolescent; (b) the death of the boy, girl, or adolescent; (c) emancipation of the adolescents either by judicial order or marriage; [or] termination of parental authority of the father or the mother by court order"), both parents have equal rights over their children. *Id.* Furthermore, children have the right to maintain regular and permanent contact with both of their parents, despite the parent's separation. *Id.*; *see* Law 136-06, art. 8; *see* Law 136-06, art. 97.

Additionally, children that are habitually residents of the Dominican Republic are not permitted to travel outside of the Dominican Republic without the express authorization of the parent or parents that have rights of custody to the children. *See* Law 136-06, art. 204; *see also* Decree 631-11, Regulation for the Application of the General Immigration Law, No. 285-04, art. 124 (Aug. 15, 2004). Thus, by unilaterally removing the Children from the Dominican Republic and retaining them in New York, Ms. Espaillat has illegally interfered with Mr. Etienne's rights of custody under the laws of the Dominican Republic.

C.    <u>Mr. Etienne Was Exercising His Rights of Custody At The Time of the Wrongful Removal and Retention</u>

After determining that the Children were removed from their habitual residence of the Dominican Republic, the Court must then determine if the petitioner has shown, by a preponderance of the evidence, that the removal was wrongful.  22 U.S.C. § 9003(e)(1); Hague Convention, art. 3.

The Hague Convention provides that the removal or retention of a child is "wrongful" when:

> It is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

> At the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

For the removal or retention to be wrongful, it is sufficient to show that the rights of custody were either being exercised or that they would have been exercised if not for the actions of the person alleged to have wrongfully removed or retained the children. *Id.*

Having established that Mr. Etienne has custody rights by way of the laws of the Dominican Republic and due to the implications of the parties' divorce judgment, the next step in the analysis is to determine whether he was exercising his rights of custody at the time of the removal.  Ms. Espaillat argues that after the parties' separation, Respondent was the primary caregiver of the Children and Petitioner failed to act as a father to their Children, thereby relinquishing his custody rights.

11

However, "[o]nce it is determined that a party had valid custody rights under the country of origin's laws, very little is required of the applicant in support of the allegation that custody rights have actually been or would have been exercised." *In re Application of Adan,* 437 F.3d 381, 391 (3d Cir. 2006). Further, "the test for finding the non-exercise of custody rights under the Hague Convention is stringent . . . The petitioner can show the exercise of custody rights by demonstrating that he or she kept or sought to keep, some sort of regular contact with the child. Essentially, nothing short of clear and unequivocal abandonment will prove that the petitioner failed to exercise his or her custodial rights." *Tsai-Yi Yang,* 499 F.3d at 277; *see Baxter v. Baxter,* 423 F.3d 363, 369 (3d. Cir 2005) ("If a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."). Thus, essentially, Mr. Etienne must establish that he has not abandoned the Children to sustain his burden.

Mr. Etienne's actions do not constitute unequivocal abandonment of the Children. Following the parties' divorce, Mr. Etienne consistently saw and cared for the Children every weekend, pursuant to the parties' verbal parenting agreement. In addition, Mr. Etienne works as a teacher at the same school in the Dominican Republic (MI-EL Christian School) that the Children attended before their wrongful removal from the Dominican Republic. Thus, Mr. Etienne was often also responsible for taking the Children to and from their after-school activities. Mr. Etienne has always supported his Children financially and would consistently send Ms. Espaillat money for their food, childcare, and other necessaries. Even after Ms. Espaillat wrongfully removed the Children from the Dominican Republic and despite the parties' strained relationship, Mr. Etienne attempted to stay in contact with the Children and inquire about their wellbeing by contacting Ms.

Espaillat, Ms. Espaillat's mother, Ms. Espaillat's brother, and the pastor at Ms. Espaillat's church in New York.  Thus, contrary to Ms. Espaillat's allegations, Mr. Etienne has always been and continues to be a father figure to and provider for his Children.

## III.    MS. ESPAILLAT'S GRAVE RISK DEFENSE IS NOT SUSTAINABLE

Under Article 13(b) of the Hague Convention, a court "'is not bound to order the return of the child' if the court finds that the party opposing return has established that return would expose the child to a 'grave risk' of physical or psychological harm." *Golan v. Saada*, 142 S.Ct. 1880, 1891-92 (2022) (quoting *Abbott*, 560 U.S. at 10).  "ICARA requires that a respondent opposing return of a child under Article 13(b) must establish this exception by clear and convincing evidence." 22 U.S.C. § 9003(e)(2)(A).

Courts have recognized "two types of grave risk that are cognizable under Article 13(b)": (1) "cases in which a child is sent to a zone of war, famine, or disease'; and (2) "those involving serious abuse or neglect." *Vasquez v. Colores*, 648 F.3d 648, 650 (8th Cir. 2011) (*citing Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003)).  Importantly, "[t]he potential harm must be severe, and there must be a probability that the harm will materialize." *Ermini v. Vittori*, 758 F.3d 153 (2d Cir. 2014) (internal quotation marks omitted); *see also Walsh v. Walsh*, 221 F.3d 204, 219 (1st Cir. 2000) ("the harm must be a great deal more than minimal"); *Babcock v. Babcock*, 503 F. Supp. 3d 862, 882 (S.D. Iowa 2020) ("'grave' means more than serious risk").  "General evidence of harm is insufficient to satisfy Article 13b." *Acosta v. Acosta*, 725 F.3d 868, 875 (8th Cir. 2013) (*citing Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 376 (8th Cir. 1995)).  "[A]djustment problems that would attend the relocation of most children" are likewise insufficient to satisfy the grave-risk requirement. *Friedrich II*, 78 F.3d at; *see also Antunez-Fernandes v. Connors-Fernandes*, 259 F.Supp.2d 800, 815-16 (N.D. Iowa 2003).

Here, Ms. Espaillat presents evidence of neither "war zone, famine, or disease" nor "serious abuse or neglect." Her evidence and argument go primarily to the Children's best interests, a question of custody properly considered by the courts in the country of habitual residence, in this case, the Dominican Republic. *See Vasquez*, 648 F.3d at 650 ("it is not relevant who is the better parent in the long run, or whether [the respondent-mother] had good reason to leave her home . . . and terminate her marriage to [the petitioner-father]"); *Forcelli v. Smith*, 2020 WL 5015838 *1, *9-10 (D. Minn. Aug. 25, 2020). The grave harm exception "does not give the court in the abducted-to country a license to speculate on where the children would be happiest; that decision is a custody matter and is reserved to the court in the country of habitual residence." *Antunez-Fernandes*, 259 F.Supp.2d at 816.

Furthermore, the psychological hardship attendant with being required to live in the nonpreferred country with the nonpreferred parent does not rise to the level of harm contemplated under the Hague Convention. The harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another." *Nunez-Escudero*, 58 F.3d at 377 (quotation omitted); *see also Whallon,* 230 F.3d at 459 (same); *Friedrich II*, 78 F.3d at 1068 ("The disruption of the usual sense of attachment that arises during most long stays in a single place with a single parent should not be a 'grave' risk of harm for the purposes of the Convention").

### A.    Evidentiary Standard

To establish that grave risk exists, a respondent must produce individual facts, each of which "need only be proven by a preponderance of the evidence," that, taken together, present "clear and convincing evidence." *Elyashiv* v. *Elyashiv*, 353 F. Supp. 2d 394, 404 (E.D.N.Y. 2005) (denying petition for return on basis of grave risk); 22 U.S.C. § 9003(e)(2)(A). To be "clear and

convincing," evidence need only be "highly probable or reasonably certain." *Ragbir* v. *Holder*, 389 F. App'x 80, 84–85 (2d Cir. 2010) (quoting Black's Law Dictionary 636 (9th ed. 2009)). Courts applying this high evidentiary standard have found that a "grave risk" to the child exists when the petitioner committed *multiple* acts of domestic abuse against the respondent or the child, and where a respondent produces evidence of abuse. *See, e.g.*, *Baran v. Beaty*, 526 F.3d 1340, 1344 (11th Cir. 2008) (finding grave risk based on respondent's testimony, petitioner's ex-wife's affidavit, and several phone conversations between petitioner and respondent that respondent secretly recorded); *Oliver A.* v. *Diana Pina B.*, 151 A.D.3d 485, 487 (N.Y. App. Div. 2017) (finding grave risk where respondent and her mother testified that petitioner committed multiple acts of domestic abuse, which were corroborated by text messages and a Domestic Incident Report); *In re Krishna* v. *Krishna*, 1997 WL 195439, at *1 (N.D. Cal. Apr. 11, 1997) (finding grave risk where respondent's claims of abuse were corroborated by a police report).

As the Second Circuit noted in the case of *Souratgar*, 720 F.3d at 96, in the context of the grave risk defense, the potential harm to the child must be severe, and the "[t]he level of risk and danger required to trigger this exception has consistently been held to be very high." (citing *Norden–Powers v. Beveridge*, 125 F.Supp.2d 634, 640 (E.D.N.Y. 2000)). The grave risk involves not only the magnitude of the potential harm but also the probability that the harm will materialize. *Van De Sande v. Van De Sande*, 431 F.3d 567, 570 (7th Cir. 2005).

### B.     Ms. Espaillat's Claims of Domestic Abuse Fail to Establish Grave Risk of Harm to the Children

As stated above, the risk of harm to the children upon repatriation must be severe. *Souratgar*, 720 F.3d at 96; *Norden–Powers*, 125 F.Supp.2d at 640; *Van De Sande*, 431 F.3d at 570. Ms. Espaillat contends that the Children will be exposed to a grave risk of harm if returned to the Dominican Republic because (a) she has been exposed to domestic abuse, perpetrated by

Mr. Etienne, and (b) the Children may be exposed to Mr. Etienne's "careless disregard, cavalier attitude verging on hostility to towards the children." ECF No. 15, ¶ 52.

In her Answer, Ms. Espaillat only alleges two (2) specific instances of "spousal abuse" perpetuated by Mr. Etienne, yet claims that she is "a victim of continual domestic violence and that the Petitioner has in the past physically, verbally, emotionally, and psychologically abused and traumatized the Respondent." ECF No. 14, ¶ 16. First, Ms. Espaillat alleges that Mr. Etienne forced Ms. Espaillat to walk from Puerto Plata to Santiago (a distance of approximately 128 miles) with M.G.E., after she witnessed Mr. Etienne and his friends smoking marijuana and voiced her opposition. ECF No. 14, ¶ 17. Second, Ms. Espaillat alleges that Mr. Etienne hit Ms. Espaillat after she requested that they take M.G.E. to the hospital when M.G.E. was ill. ECF No. 14, ¶ 18. However, Ms. Espaillat does not allege any specific instances of harm perpetuated by Mr. Etienne against the Children and does not provide any evidence of the same.

Because "spousal abuse . . . is only relevant under Article 13(b) if it seriously endangers the *child*," Ms. Espaillat will not be able to prove, by clear and convincing evidence, that these instances of alleged "spousal abuse," justify the court's denial of repatriation of the Children. *Souratgar*, 720 F.3d at 103-4 ("The Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject the child to a grave risk of physical or psychological harm.") Additionally, the risks discussed by Ms. Espaillat do not represent the type of "grave risk" against which Article 13(b) was designed to protect. *Id.* at 103; *see also Whallon*, 230 F.3d at 459–60 (grave risk not established notwithstanding the alleged instances of verbal and physical abuse committed on the mother by the father as none of the abusive conduct was directed at the child and the evidence did not show a clear and long history of abuse); *Foster v. Foster*, 654 F. Supp. 2d 348, 361 (W.D. Pa. 2009) ("Petitioner's parenting

skills and approach undeniably leave much to be desired. However, I find that Respondent has failed to demonstrate by the clear and convincing standard that [the child] would be subjected to a grave risk of physical harm if he were returned to Canada. The spankings, name-calling and physical discipline described by Respondent are more akin to ... isolated and sporadic abuse ... that, while regrettable, [is] insufficient to establish a grave risk of harm to the child, than to ... pervasive, severe, and dangerous behavior." ) (quotations and citations omitted); *Basil v. Ibis Aida de Teresa Sosa,* 2007 WL 2264599, at *13 (M.D. Fla. Aug. 6, 2007) (grave risk defense not established where the respondent testified that the petitioner had a history of psychological abuse towards her with some degree of physical conduct, such as shaking her or throwing objects, but the spousal abuse did not occur in the children's presence and the respondent testified that she would have allowed the petitioner to have visitation with the children in the United States, which "militate[d] against the notion that the petitioner would endanger the children"); *Ibarra v. Quintanilla Garcia*, 476 F. Supp. 2d 630, 636 (S.D. Tex. 2007) (grave risk defense not established where "[d]efendant testified that plaintiff abused her physically and emotionally while in Mexico and failed to support her and the child, but there was no evidence that the plaintiff ever physically abused the child"); cf. *Gomez v. Fuenmayor,* 812 F.3d 1005, 1012 (11th Cir. 2016) (grave risk established, despite lack of violence or threats to the child, based on finding that the removing parent faced a grave risk of harm if he were to return to that country due to his "ha[ving] encountered repeated threats on his life from [the left-behind parent and her husband], the shooting of his girlfriend minutes after he (and [the child]) had been in the car with her, vandalism of his mother's car, the presence of armed guards associated with [the left-behind parent and her husband] at court hearings, and repeated instances of drugs being planted in [the removing parent's] mother's

17

car," particularly since the district court had found that it was "highly probable" that the left-behind parent and her husband were behind these various incidents).

In fact, contrary to Ms. Espaillat's claims, Mr. Etienne has a deep, loving relationship with the Children, which has been severely affected by Ms. Espaillat's wrongful removal and retention of the Children in New York without Mr. Etienne's consent. As in *Souratgar*, Respondent has not presented any evidence that the Children have suffered psychologically from spending time with their father in the Dominican Republic. *Id.* In fact, Ms. Espaillat has only provided evidence that speaks to the Children's psychological damage that they were forced to endure after Ms. Espaillat uprooted their lives and their relationship with their father by wrongfully removing them from the Dominican Republic and retaining them in New York. Moreover, there are ameliorative measures available in the Dominican Republic, which would eliminate or mitigate any risks to the Children. *See Golan*, 142 S. Ct. at 1880.

Furthermore, the only evidence that exists demonstrates that the Children were happy in the presence of their father, Mr. Etienne. Mr. Etienne's parenting time took place on myriad occasions without incident. Mr. Etienne has exhibited great love and concern for the Children. The Children are happy when they are with their father and have formed a strong bond with their father. The grave risk of harm affirmative defense under Article 13(b) of the Hague Convention is inapplicable in the instant action. Thus, the Children must be returned to their habitual residence in the Dominican Republic. Ordering to the contrary, in other words, denying repatriation of the Children to their habitual residence, would completely undermine the very purpose of the Convention—to restore children to their rightful homes.

18

## IV.    CONCLUSION

Mr. Etienne has made a prima facie case of wrongful removal and retention of the subject Children – the Children, who are habitual residents of the Dominican Republic, are presently in New York in clear violation of Mr. Etienne's rights of custody under the laws of the Dominican Republic.  Ms. Espaillat has violated, and continues to violate, Mr. Etienne's custody rights.  Ms. Espaillat clings to the infrequently invoked grave risk exception as her sole affirmative defense. She has not met her burden of proof and the narrow construction the Court must give to this defense.  The evidence is clear: Ms. Espaillat wrongfully removed the subject Children from the Dominican Republic and wrongfully retained the subject Children in New York and, as she failed to prove her sole affirmative defense, the Court must order the immediate return of M.G.E. and A.F.E. to their habitual residence in the Dominican Republic.

Dated:  August 10, 2022
        New York, New York

Respectfully submitted,

_____
Richard Min
Green Kaminer Min & Rockmore LLP
Attorney for Petitioner
420 Lexington Avenue, Suite 2821
New York, NY 10170
(212) 235-1786

19