UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
                                                        :
JOSEPH MARCEL ETIENNE JEAN POIX,                        :
                                                        :
                    Petitioner,                         :
                                                        :                22 Civ. 4980 (JPC)
         -v-                                            :
                                                        :          FINDINGS OF FACT AND
SUSIBEL ALTAGRACIA ESPAILLAT SANTANA,                   :          CONCLUSIONS OF LAW
                                                        :
                    Respondent.                         :
                                                        :
------------------------------------------------------------------- X

JOHN P. CRONAN, United States District Judge:

    Joseph Marcel Etienne Jean Poix ("Petitioner") and Susibel Altagracia Espaillat Santana

("Respondent") were married in the Dominican Republic from 2014 to 2020.  During their

marriage, they had two children, referred to herein by their initials, M.G.E. and A.F.E.

(collectively, the "children").  Although their parents resided in the Dominican Republic at the

time of their conception, both children were born in the United States, making them U.S. citizens.

In August 2021, after the marriage ended, Respondent traveled to the United States with M.G.E.

and A.F.E., while Petitioner remained in the Dominican Republic.  Respondent and the children

have since remained in the New York City area.

    This case arises under the Convention on the Civil Aspects of International Child

Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (the "Hague Convention" or the

"Convention").  Petitioner contends that Respondent removed M.G.E. and A.F.E. from the

Dominican Republic to the United States unlawfully and without his consent, *see* Dkt. 1

("Petition") ¶ 1, and he seeks an order requiring the children's return to the Dominican Republic,

*id.* at 12.  The question of whether the children must return to the Dominican Republic is of course

but one aspect of the broader custody dispute resulting from the dissolution of the parties'

marriage.  But it is not for this Court to adjudicate the children's custody:  as Congress has explicitly declared in the legislation implementing the Convention, this Court is empowered "to determine only rights under the Convention and not the merits of any underlying child custody claims."  22 U.S.C. § 9001(b)(4).  Any determination of the custodial issues must be made by the courts of the Dominican Republic, under whose authority the parties were married and divorced and under whose authority custody arrangements for the children have been determined.  Thus, in resolving this Petition, the Court expresses no view as to what upbringing for the children would be appropriate, fair, or otherwise in the best interests of those involved.  Indeed, the Convention explicitly instructs that "[a] decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."  Hague Convention art. 19. Instead, this Court herein addresses only the much narrower issue of whether to order the children returned to the Dominican Republic given the circumstances of their removal from that country to the United States.

On August 17th and 18th of this year, the Court held a bench trial on that issue.  At that trial, the Court received documentary exhibits and live testimony from Petitioner, Respondent, and their witnesses.  Under the Hague Convention and the federal statute that implements it, a *prima facie* case for return is established if the children were removed from their country of habitual residence, in violation of rights of custody under that country's laws, so long as the holder of those rights was exercising them at the time of the removal (or would have exercised them but for the removal). Only the last of these three elements is in dispute, and it plainly has been proven.  Respondent also has raised two affirmative defenses permitted under the Hague Convention:  first, that Petitioner was not exercising his custody rights at the time of removal, and second, that a grave risk exists that returning the children would expose them to physical or psychological harm or would

otherwise place them in an intolerable situation.  Respondent failed to carry her burden of establishing either defense.  Consequently, the Court grants the Petition and orders the children returned to the Dominican Republic.

## I.  Legal Framework

The Hague Convention was concluded on October 25, 1980.  *See* T.I.A.S. No. 11670.  It entered into force for the United States on July 1, 1988, *see id.*, and it entered into force for the Dominican Republic on June 1, 2007, *see* Bureau of Consular Aff., U.S. Dep't of State, *U.S. Hague Convention Treaty Partners*, https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/abductions/hague-abduction-country-list.html (last visited Oct. 17, 2022).  To implement the Convention, Congress enacted the International Child Abduction Remedies Act ("ICARA"), Pub. L. No. 100-300, 102 Stat. 437 (1988) (codified as amended at 22 U.S.C. §§ 9001-9011).  ICARA authorizes "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of the child" to "commenc[e] a civil action by filing a petition for the relief sought." 22 U.S.C. § 9003(b).  "The court in which an action is brought under subsection (b)," in turn, "shall decide the case in accordance with the Convention."  *Id.* § 9003(d)

Among other provisions, the Convention provides a mechanism "to secure the prompt return of children wrongfully removed to . . . any Contracting State."  Hague Convention art. 1(a). Two conditions must be met for "[t]he removal or the retention of a child . . . to be considered wrongful."  *Id.* art. 3.  First, that removal most be "in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention."  *Id.* art. 3(a). Second, removal or retention is wrongful only if "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal

or retention." *Id.* art. 3(b).  Children wrongfully removed or retained under the Convention must presumptively be returned:  "Where a child has been wrongfully removed or retained in terms of Article 3 . . . the judicial or administrative authority of the Contracting State where the child is . . . shall order the return of the child forthwith."  *Id.* art. 12.

In addition to setting forth the conditions that must be met for a child's return to be presumptively required, the Convention sets forth a number of circumstances that may overcome that presumption.  *Id.* arts. 12, 13, 20.  Respondent claims that two such exceptions apply in this case.  If either applies, "the judicial or administrative authority of the requested State is not bound to order the return of the child."  *Id.* art. 13.  First, return is not required if "the person, institution or other body having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention."  *Id.* art. 13(a).  Second, return is not required if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  *Id.* art. 13(b).[1]

In addition to directing courts to resolve actions for the return of a child according to the substantive standards set forth in the Convention, ICARA specifies the standards of proof that parties must meet to prevail in such an action.  A petitioner "in the case of an action for the return of a child" bears the burden of establishing "by a preponderance of the evidence . . . that the child has been wrongfully removed or retained within the meaning of the Convention."  22 U.S.C. § 9003(e)(1).  In turn, "a respondent who opposes the return of the child has the burden of

---

[1] Other exceptions permit the retention of a child if proceedings to return the child were commenced one year or more after the wrongful removal or retention and "it is demonstrated that the child is now settled in its new environment," *id.* art. 12, if "the child objects to being returned and has attained an age and degree of maturity at which it is appropriate to take account of its views," *id.* art. 13, or if the return of the child "would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms," *id.* art. 20.

establishing" whether any exception exists that would permit the retention of a child who was wrongfully removed or retained, with the standard of proof depending on which exception is invoked.  *Id.* § 9003(e)(2).  A respondent must produce "clear and convincing evidence that . . . the exception[] set forth in article 13b . . . of the Convention applies," *id.* § 9003(e)(2)(A)—that is, that the child's return would create a grave risk of exposing the child to physical or psychological harm or of otherwise placing the child in an intolerable situation, *see* Hague Convention art. 13(b).  But a respondent need show only "by a preponderance of the evidence that any other exception set forth in article . . . 13 of the Convention applies," 22 U.S.C. § 9003(e)(2)(B), including the exception permitting retention if the person or entity whose rights of custody were violated by the child's removal was not actually exercising those rights at the time of the removal, *see* Hague Convention art. 13(a).

Thus, to establish his *prima facie* case in this action, Petitioner must prove that (1) M.G.E. and A.F.E. were "habitually resident in" the Dominican Republic and then were "removed to or retained in" the United States; (2) the children's removal or retention was in breach of Petitioner's custody rights under the law of the Dominican Republic; and (3) Petitioner "was exercising those rights at the time of the removal or retention."  *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).  Respondent concedes the first two elements, and for reasons that follow, the third is plainly met.  Once Petitioner has established those three elements, the burden shifts to Respondent.  The children must be returned to the Dominican Republic unless Respondent establishes by a preponderance of the evidence that Petitioner failed to exercise his custody rights at the time of the removal or by clear and convincing evidence that a grave risk exists that returning the children would expose them to physical or psychological harm or would otherwise place them in an intolerable situation.  *See Blondin v. Dubois*, 189 F.3d 240, 245-46 (2d Cir. 1999).  Because

Respondent has failed to carry her burden as to either exception, the Convention and ICARA require this Court to order the children's return to the Dominican Republic.

## II.  Findings of Fact

"In an action tried on the facts without a jury," the Court "find[s] the facts specially and state[s] its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  The Court therefore makes the following findings of fact.  Additional facts not specifically found in this section may nonetheless be included in the Court's conclusions of law *infra* at III.  *Cf. Flatiron Acquisition Vehicle, LLC v. CSE Mortgage LLC*, 502 F. Supp. 3d 760, 769 (S.D.N.Y. 2020) ("For the avoidance of doubt, the Court has also found additional facts that are relevant to the analysis, which are not included in this section of the opinion, but are instead embedded in the discussion section.").

### A.  Witness Credibility

At the bench trial, the Court heard testimony from Petitioner, *see* Tr. at 53:15-105:7, and Respondent, *see id.* at 106:4-146:24, 165:1-200:24.[2]  In addition, the Court heard testimony from Plaintiff's expert witness, Francisco Alberto Martinez Pujols, who discussed Dominican family law, *see id.* at 12:22-52:24, and from Respondent's two fact witnesses, Marcres Bulduan, *see id.* at 203:2-210:24, and Josue Lara, *see id.* at 214:13-220:21.  "It is within the province of the district court as the trier of fact to decide whose testimony should be credited."  *Krist v. Kolombos Rest. Inc.*, 688 F.3d 89, 95 (2d Cir. 2012) (citation omitted).  Thus, the Court begins with its findings concerning the credibility of these trial witnesses.

---

[2] The transcript from the August 17-18, 2022 bench trial, Dkts. 57-58, is cited as "Tr." and the exhibits received in evidence at trial are cited as "Exh." herein.

### 1. Petitioner

The Court finds that Petitioner's testimony was credible.  Although Petitioner testified remotely through a video display, the Court was able to observe him while he testified, and his demeanor at the time supports this finding of credibility.  Petitioner answered the questions put to him directly, and he was not evasive.  Furthermore, while he testified about certain events that took place some time ago, and thus he may not have remembered every detail, the Court perceived him as attempting to honestly recall those events to the best of his ability.

Particularly significant to the Court's resolution of the Petition is Petitioner's testimony about his relationship with his children prior to their removal from the Dominican Republic.  The Court especially finds Petitioner's testimony on this subject to be credible and notes that it was powerfully corroborated the photographs received in evidence, *see* Exh. P17, some of which depicted M.G.E. and/or A.F.E. with Petitioner, and others of which depicted the children alone and were taken by Petitioner, Tr. at 60:11-68:17.  The photographs corroborated Petitioner's testimony that he exercised his visitation rights following his divorce from Respondent and was maintaining a relationship with the children until shortly before Respondent removed them from the Dominican Republic.  *See id.* at 59:2-60:10.

Finally, Petitioner provided a credible explanation of the dispute that occurred between him and Respondent in Puerta Plata, a city in the Dominican Republic, in 2017, *id.* at 95:1-103:9, which is discussed further *infra* at II.A.2 and III.B.  His account of the marijuana use of the other adults present there and of his and Respondent's reactions was plausible and realistic, as was his account of how he reacted once Respondent left with the elder of their two children.  Consequently, the Court will generally credit Petitioner's testimony.

2. **Respondent**

The Court finds that Respondent's testimony was largely credible as well. Respondent testified in person and the Court was able to observe her testimony from the witness stand. In general, her demeanor suggested that she was testifying truthfully, and at various points she spoke with obvious and understandable emotion. Nonetheless, at some points her testimony did ascribe a character to certain events, particularly the children's diagnosis with COVID-19 in December 2020, that was in tension with documentary evidence submitted for the purpose of impeachment. On direct examination, Respondent testified that Petitioner "didn't care that the kid had coronavirus" and "didn't care about their safety." Tr. at 142:10-13. As Respondent conceded on cross examination, however, Petitioner messaged her through WhatsApp to express his concerns about the children's safety and to coordinate their medical care. *See* Exh. P2C; Tr. at 188:10-191:3. But while the Court finds that Respondent occasionally presented events in a light that reflected her desired spin on what transpired rather than a purely neutral perspective, her characterization of factual matters appeared largely credible.

There is one prominent exception to the general accuracy of Respondent's factual representations, however. In her Verified Answer to the Petition, which Respondent herself signed under penalty of perjury, *see* Dkt. 15-1, she alleged that following the 2017 incident in Puerta Plata, Petitioner "forced the Respondent to needlessly travel in the Dominican Republic, walking from Puerto Plata to Santo Domingo," Dkt. 15 ("Answer") ¶ 17. During the trial, however, Respondent admitted that she did not walk from Puerto Plata to Santo Domingo but instead traveled by taxi and by bus. Tr. at 125:11-126:10; 182:22-24. Subsequently, she explained this discrepancy as the result of a misunderstanding with her attorney, given her imperfect command of English. *Id.* at 182:25-183:2. And her attorneys agreed that the error arose due to difficulties

arising from translating her communications into English, not because Respondent had in fact stated that Petitioner forced her to walk from Puerto Plata to Santo Domingo. *Id.* at 200:1-17. Because the Court accepts this explanation for the untrue allegation, it will not use the discrepancy between the Answer and Respondent's testimony as a basis for doubting her credibility.

### 3. Non-Party Witnesses

While Petitioner and Respondent both testified at considerable length about a number of different factual questions relevant to the disposition of the Petition, the remaining witnesses testified more briefly and concerning matters of limited scope.  Mr. Martinez Pujols, Plaintiff's expert, testified about Dominican family law, particularly the parental authority granted to noncustodial parents following a divorce. *See generally* Tr. at 12:22-52:24.  Ms. Bulduan and Mr. Lara, two of Respondent's friends, testified about their communications with Respondent and their observations of her and the children during the marriage. *See generally id.* at 203:2-210:24, 214:13-220:21.  The Court finds all non-party witnesses to be credible.  Furthermore, their testimony, whether about matters of fact or Dominican law, was by and large not disputed by the opposing party at trial, with one exception discussed *infra* at II.C.  Thus, the Court will credit the testimony provided by the non-party witnesses.

### B. Undisputed Factual Background

Much of the trial testimony, particularly testimony concerning the family history of Petitioner, Respondent, and the children, was not disputed by the opposing side.  Because the Court generally found credible the testimony of all the witnesses who appeared at trial, the Court will generally credit such uncontradicted testimony in reaching its conclusions of law.  Nonetheless, the Court will not explicitly enumerate, at this stage, every unopposed fact to which those witnesses testified; rather, most such facts will be cited, as relevant, when they support particular

conclusions of law that the Court will draw.  The Court will, however, briefly outline the history of the parties' relationship and the actions that led to the present dispute.

Petitioner, who was born in Haiti in 1968, is a citizen of the Dominican Republic and of Haiti, Tr. at 54:2-4, 9-10, while Respondent was born in the Dominican Republic in 1986, *id.* at 107:3-10.  The two met in 2013, *id.* at 107:23-25, and were married in the Dominican Republic in April 2014, *id.* at 55:1-6.  Following their marriage, they resided in Santo Domingo in the Dominican Republic.  *Id.* at 56:12-14, 116:15-20.  They have two children.  *Id.* at 55:12-15.  M.G.E was born in Manhattan in January 2016, Petition, Exh. C at 1, and A.F.E. was born in Manhattan in October 2017, *id.* at 3.  Soon after each child was born in the United States, thereby securing U.S. citizenship, Tr. at 56:25-57:1, Respondent and the child returned to the Dominican Republic, *id.* at 56:17-19, 120:6-10.  In April 2020, the parties separated, and Respondent and the children moved out of the family's joint residence.  *Id.* at 57:5-21.  The parties subsequently were divorced by mutual consent in December 2020.  Exh. P5.

At some point around the end of July 2021, Respondent moved with the children from Santo Domingo to Santiago, the city in the Dominican Republic where her family resided.  Tr. at 104:8-10; *see also id.* at 144:11.  Then, on August 22, 2021, Respondent and the children traveled from the Dominican Republic to the United States.  *Id.* at 165:5-11.  They currently reside in New York City, *id.* at 107:11-15, where Respondent works as a teacher, *id.* at 175:2-9.  Petitioner realized that Respondent and the children had left the Dominican Republic for the United States at some point in September 2021.  *Id.* at 71:25-72:12.

## C.  Disputed Matters of Fact

While much of the factual evidence presented at trial was undisputed, the parties did disagree prominently about one factual matter.  Respondent testified at trial that on one occasion,

when she was pregnant with her younger child, A.F.E., Petitioner "took my hands and he started hitting me with my hands." Tr. at 127:7-8. Respondent offered corroboration for this allegation through the testimony of Mr. Lara, to whom, she claimed, she sent a photo of her injuries shortly after the incident occurred. *Id.* at 127:14-16. Mr. Lara, in turn, testified that on an occasion in 2017 or 2018, Respondent sent him a photograph of injuries to her face and neck. *Id.* at 216:8-19. After sending him the picture, Mr. Lara further explained, Respondent told him during a phone call that Petitioner "was like in discussion with her, taking her own arm and beating her with her arms. It was like fighting. But, you know, it's like trying to control her with her arms, but hitting her with her own arms." *Id.* at 219:8-11. Petitioner adamantly denied that there was "an incident where [he] physically struck [Respondent] on her face repeatedly and she had injuries and bruises." *Id.* at 89:1-2, 5.

As noted, the Court generally found both Petitioner's and Respondent's testimony to be credible. And the general credibility of the two parties would make it difficult to resolve their contradictory testimony in order to find whether the alleged incident in fact occurred. To the extent that such a factual finding were necessary for the Court to decide the Petition, the corroboration provided by Mr. Lara's testimony would weigh reasonably strongly in breaking the deadlock that might otherwise be produced from the parties' own statements. Nonetheless, as will be explained *infra* at III.B, the Court need not find whether the incident described by Respondent did in fact occur, because even were Respondent's testimony about it accepted, she still would not succeed in carrying her burden to establish the grave risk exception of Article 13(b). Consequently, for the purposes of the following analysis, the Court will assume the accuracy of Respondent's trial testimony about the incident. To be clear, that assumption does not reflect a finding that

Respondent's testimony about the incident was truthful or that Petitioner's testimony about it was not, or a finding that the event in fact occurred as Respondent described at trial.

### III.  Conclusions of Law

The Court first explains why Petitioner has proven that the children were wrongfully removed within the meaning of Article 3 of the Convention, then turns to why Respondent has not proven any defense that might permit the children, despite their wrongful removal, to be retained in the United States.

### A.  Wrongful Removal

A petitioner must prove three elements to prevail in an action under the Hague Convention for the return of a child:  "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention."  *Gitter*, 396 F.3d at 130-31; *see* Hague Convention art. 3(a) (defining the removal or retention of a child as wrongful if it breached rights of custody "under the law of the State in which the child was habitually resident immediately before the removal or retention").  Of the three elements, Respondent concedes the first two.  Tr. at 201:23-202:9.  Despite that concession, the Court will briefly review the evidence presented at trial establishing those two elements.  Respondent does deny that Petitioner has proven the third element—namely, that he was exercising his custody rights at the time Respondent removed the children from the Dominican Republic.  *Id.* at 202:10-13.  Nonetheless, based on specific evidence presented at trial, the Court concludes that this element, too, has been proven.  Consequently, Petitioner has discharged his burden of proving that the children were wrongfully removed from the Dominican Republic.

### 1. **Habitual Residence**

The country of a child's habitual residence is "[t]he place where a child is at home, at the time of removal or retention." *Monasky v. Taglieri*, 140 S. Ct. 719, 726 (2020). "[L]ocating a child's home," in turn, "is a fact-driven inquiry." *Id.* at 727. Consequently, in determining the habitual residence of a child, "courts must be sensitive to the unique circumstances of the case and informed by common sense." *Id.* (internal quotation marks omitted). Two factors have commonly been cited as particularly relevant to determining habitual residence: "the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared," and "whether the evidence unequivocally points to the conclusion that the child has acclimatized" to a particular location. *Gitter*, 396 F.3d at 134. In some more difficult cases, those factors may weigh in different directions—for example, if at the time of removal a child had become acclimatized to living in one country even though his parents did not intend for that country to become his permanent home. *E.g.*, *id.* at 135-36 (instructing the district court to consider "whether the circumstances in which [the child] lived in Israel support a finding that his habitual residence changed from the United States to Israel, or whether his parents' last shared intent that his habitual residence be in the United States should control"). At the same time, "[c]ommon sense suggests that some cases will be straightforward: Where a child has lived in one place with her family indefinitely, that place is likely to be her habitual residence." *Monasky*, 140 S. Ct. at 727.

Here, the question of the children's habitual residence is straightforward. The children had not quite "lived in one place with [their] family indefinitely," *id.*, prior to their removal from the Dominican Republic, since each was born in New York and lived there for approximately the first one or two months of their lives before returning to the Dominican Republic. Tr. at 56:15-19,

120:4-10.   But outside that period, the Dominican Republic has been the children's home throughout their lives.  They attended school in the Dominican Republic from 2018 (M.G.E.) and 2019 (A.F.E.) until they left the country in August 2021, and before beginning school they attended daycare in the Dominican Republic.  *Id.* at 57:22-58:8.  No evidence at trial indicated that the children ever lived outside the Dominican Republic until they traveled to the United States in 2021.  And both Petitioner and Respondent testified that they resided in Santo Domingo throughout their marriage, including during the period after the children were born.  *Id.* at 56:12-14, 116:18-20.  Thus, the evidence at trial established that, aside from their births, M.G.E. and A.F.E. lived in the Dominican Republic until Respondent removed them to the United States in August 2021.  *Id.* at 116:15-20.

The testimony further revealed that, while married, Petitioner and Respondent both intended the Dominican Republic to be the children's habitual residence.  Respondent testified she traveled to the United States for the children's births in order to secure the benefits of U.S. citizenship, but that she and Petitioner intended that she would return to the Dominican Republic after each child was born.  *Id.* at 117:22-118:3.  Thus, at that point the shared intention of the children's parents was for the Dominican Republic to be their habitual residence.  And since no evidence suggested that at any later point Petitioner and Respondent shared the intention for the children to live in the United States, "the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared," *Gitter*, 396 F.3d at 134, also weighs in favor of finding the Dominican Republic to be the children's habitual residence as of the time of their removal.  Consequently, as Respondent conceded at trial, Tr. at 202:5-9, Petitioner has discharged the first element of his burden of proof:  M.G.E. and A.F.E. were habitually resident in the Dominican Republic prior to their removal.

## 2. **Rights of Custody**

Turning to the second element, the Convention provides that the removal or retention of a child is wrongful if "it is in breach of rights of custody." Hague Convention art. 3(a). "Rights of custody" are defined to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." *Id.* art. 5(a). As the Supreme Court has held, even minimal parental rights to determine a child's place of residence may qualify as "rights of custody" under the Convention. In particular, a parent's bare *ne exeat* right—that is, a noncustodial parent's right to prevent a child from being taken out of the country by the custodial parent—is a "right of custody" under the Convention, and thus removing a child from a country without the consent of a parent holding a *ne exeat* right is "in breach of rights of custody" within the meaning of Article 3 of the Convention. *Abbott v. Abbott*, 560 U.S. 1, 10 (2010) ("[T]he Court determines that Mr. Abbott's *ne exeat* right is a right of custody under the Convention."). Thus, Respondent's removal of the children would have breached Petitioner's rights of custody under the Convention so long as Dominican family law grants Petitioner even a *ne exeat* right.

In order to determine the scope of Petitioner's parental rights under Dominican law, the Court takes judicial notice of certain translated provisions of Dominican law, *see* Dkts. 29, 39, 56, and further relies on the testimony of Plaintiff's expert witness, Mr. Martinez Pujols, a practitioner of Dominican family law. Dominican family law grants "[p]arental authority . . . equally to the father and mother." Dkt. 29-1, Dominican Republic Law 136-03, art. 67 (noticed at Dkt. 39). That parental authority ends when a child reaches adulthood, marries, or dies, or when it is terminated by a court. *Id.* art. 72. The children are not adults, they have not married, and they have not died, nor has Petitioner's parental authority been terminated by a court. Respondent was granted temporary guardianship of the children in the decree of divorce that dissolved their marriage. Exh.

15

P5 at 2.  But an award of temporary guardianship to one parent does not constitute an order terminating the other's parental authority.  Tr. at 30:6-12, 30:15.  Thus, Petitioner retained parental authority over the children after his divorce from Respondent, including at the point when she removed them from the Dominican Republic to the United States.

Under Dominican law, Petitioner's parental authority grants him a *ne exeat* right to prevent the children from being taken from the country without his consent:  "If one of the parents intends to leave the country with one of their sons or daughters, they may not do so without the written consent of the other [parent]."  Dkt. 56, Dominican Republic Law 136-03, art. 204; *see also* Tr. at 30:16-31:4.  Indeed, Respondent herself acknowledged to Petitioner when renewing the children's passports that she would need his consent to take them out of the country.  Exh. P2A.  Because she removed the children from the Dominican Republic without Petitioner's written consent, Respondent violated Petitioner's *ne exeat* right under Dominican family law.  And since a *ne exeat* right is a right of custody under the Convention, *see Abbott*, 560 U.S. at 10, the removal was "in breach of rights of custody" under Article 3 of the Convention, as Respondent concedes, Tr. at 202:5-9.

### 3.  Exercise of Custodial Rights

Finally, for the removal of a child to be wrongful under Article 3 of the Convention, the custody rights that were breached by the child's removal must actually have been exercised at the time of removal, or would have been exercised but for the removal.  Hague Convention art. 3(b).  The subject matter underlying this third element overlaps with one of Respondent's asserted defenses.  Thus, the question of Petitioner's exercise of his custodial rights at the time of the children's removal imposes burdens of proof on both parties.  Initially, in accordance with Article 3 of the Convention, removal is wrongful only if at the time of removal a petitioner actually was

exercising the rights of custody that the removal breached.  Hague Convention art. 3(b).  Because this element is necessary to establish a child's wrongful removal under the Convention, Petitioner bears the burden of proving it at trial by a preponderance of the evidence.  *See* 28 U.S.C. § 9003(e)(1)(A).  Next, however, a respondent may avail herself of a defense that challenges the petitioner's exercise of a custodial right.  Article 13 of the Convention establishes that a child's return is not required if "the person . . . which opposes its return establishes that:  *a)* the person . . . having the care of the person of the child was not actually exercising the custody rights at the time of removal or retention."  Hague Convention art. 13.  Respondent has asserted such a defense here.  And a respondent, not a petitioner, bears the burden of proving by a preponderance of the evidence that the exception under Article 13(a) applies.  *See* 28 U.S.C. § 9003(e)(2).

The relationship between these two provisions—the third element of wrongful removal and the defense for failure to exercise custodial rights—is helpfully elucidated in the Explanatory Report to the Hague Convention.  *See* Elisa Pérez-Vera, *Explanatory Report*, *in* III Acts and Documents of the Fourteenth Session 426, ¶¶ 72-74, at 448-49 (Hague Conference on Private International Law 1980), https://assets.hcch.net/docs/a5fb103c-2ceb-4d17-87e3-a7528a0d368c.pdf (last accessed Oct. 17, 2022) ("Report").  The Second Circuit has recognized the Report as "an authoritative source for interpreting the Convention's provisions," *Croll v. Croll*, 229 F.3d 133, 137 n.3 (2d Cir. 2000), *abrogated on other grounds by Abbott*, 560 U.S. 1, and the State Department has explained that the Report is "the official history and commentary on the Convention and is a source of background on the meaning of the provisions of the Convention available to all States becoming parties to it," Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10494, 10503 (Mar. 26, 1986).  As the Report explains, these two provisions jointly structure the burdens of proof that each party must bear with respect

to the exercise of custodial rights.  Report ¶ 73, at 448; *see also Reyes Olguin v. Cruz Santana*, No. 03 Civ. 6299 (JG), 2004 WL 1752444, at *4-5 (E.D.N.Y. Aug. 5, 2004).  First, Article 3(b) of the Convention requires the petitioner to "provide only some preliminary evidence that he actually took physical care of the child."  Report ¶ 73, at 448; *accord Reyes Olguin*, 2004 WL 1752444, at *4 n.3 (explaining that this provision places "the burden of production" on the petitioner).  If that preliminary evidence is produced, then the burden shifts to the respondent, who must show "that the guardian had not actually exercised his rights of custody."  Report ¶ 73, at 449; *accord Reyes Olguin*, 2004 WL 1752444, at *4 n.3 (explaining that this provision places on the respondent "the ultimate burden of persuasion on the actual-exercise issue").

Even though Article 3(b) and Article 13(a) are distinct provisions of the Convention, and even though each imposes a burden on a different party, both concern whether a petitioner exercised his or her rights of custody, and the same factual evidence is therefore relevant in analyzing each provision.  Thus, the Court's discussion will jointly consider both whether Petitioner has satisfied his burden under Article 3(b) of the Convention and, if so, whether Respondent has discharged the burden shifted to her under Article 13(a) of the Convention.  Unlike the first two elements of wrongful removal under the Convention, Respondent does contest whether Petitioner was exercising his custodial rights at the time of removal.  Tr. at 202:10-13.  Nonetheless, for reasons that follow, the evidence presented at trial clearly demonstrates that Petitioner was exercising his rights of custody at the time the children were removed from the Dominican Republic.

The Hague Convention does not itself define the extent to which a parent must be involved in a child's life in order to qualify as exercising his or her rights of custody under the Convention.  But in applying the Convention, U.S. courts, including in this District, have generally treated

relatively minimal parental involvement as sufficient to establish the exercise of rights of custody. *See, e.g.*, *Baxter v. Baxter*, 423 F.3d 363, 370 (3d Cir. 2005) ("[T]he test for finding the non-exercise of custody rights under the Hague Convention is stringent." (citation omitted)); *Friedrich v. Friedrich*, 78 F.3d 1060, 1066 (6th Cir. 1996) ("[A] person cannot fail to 'exercise' . . . custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child.  Once it determines that the parent exercised custody rights in any manner, the court should stop—completely avoiding the question whether the parent exercised the custody rights well or badly." (footnote omitted)); *In re D.T.J.*, 956 F. Supp. 2d 523, 532-33 (S.D.N.Y. 2013) ("The standards applied to evaluating whether a petitioner is exercising custody at the time of removal are instead lenient: They have been held to require fairly minimal activity on the part of a petitioner.").  In the Sixth Circuit's words, "any attempt to maintain a somewhat regular relationship with the child should constitute 'exercise.'"   *Friedrich*, 78 F.3d at 1066. Consequently, courts have found an exercise of custodial rights based on evidence showing that a parent had some involvement in his or her child's life, even if that involvement was limited.  *See, e.g.*, *Whallon v. Lynn*, 230 F.3d 450, 453, 459 (1st Cir. 2000) (holding that a parent exercised rights of custody because he spent every other weekend with his child, paid child support, and participated in various miscellaneous parenting tasks); *Velozny ex rel. R.V. v. Velozny*, 550 F. Supp. 3d 4, 14 (S.D.N.Y. 2021) (holding that a parent exercised rights of custody because he "continued to make attempts to visit and contact the children until they were removed"), *aff'd*, No. 21-1993-cv, 2021 WL 5567265 (2d Cir. Nov. 29, 2021); *In re D.T.J.*, 956 F. Supp. 2d at 532 (holding that a parent exercised rights of custody by visiting with a child nearly every other weekend, even though scheduled visitations were frequently missed); *In re Skrodzki*, 642 F. Supp. 2d 108, 115 (E.D.N.Y. 2007) (holding that a parent exercised rights of custody by visiting with the children twice per

week and paying child support); *Armiliato v. Zaric-Armiliato*, 169 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (holding that a parent exercised rights of custody by providing financial support, visiting regularly, and participating in decisions about his child's education and medical care).

The evidence submitted at trial easily satisfied Petitioner's burden of showing that his involvement with the children prior to their removal constituted the exercise of his rights of custody. After the separation, he saw them "[a]t least once a week on a regular basis." Tr. at 59:6. Those visits involved a wide range of activities—going to the theater, going to the mall, going to parks, and more. *Id.* at 60:3-10. Petitioner has documented those activities through photographs submitted into evidence, which depict him and his children engaged in various activities both before and after his separation from Respondent, including visiting parks, playing games, and simply spending time with one another. *See generally* Exh. P17. And in addition to this informal contact, Petitioner routinely interacted with M.G.E. and A.F.E. at the MI-EL Christian School, where the children attended and where he worked. Tr. at 57:22-58:2, 59:17-20. This visitation and contact with the children plainly amounted to the "fairly minimal activity on the part of a petitioner," *In re D.T.J.*, 956 F. Supp. 2d at 533, required for the exercise of rights of custody.

Beyond his in-person interactions with the children, Petitioner further exercised his rights of custody by helping with the children's expenses and participating in childcare—as Respondent herself acknowledged at trial. After the separation, Petitioner took care of the children on occasions when Respondent was unable to look after them, Tr. at 171:18-172:21, and he took them to activities, such as piano lessons, when he was available, *id.* at 173:8-15. Petitioner also helped to supervise their health and education. For example, he wrote a letter to M.G.E.'s pre-school teacher explaining why he thought M.G.E. should be advanced to kindergarten ahead of schedule. *See* Exh. P2C. And he helped coordinate the children's medical care when they were diagnosed

with COVID-19, working with Respondent to consult doctors on their behalf and to purchase medicine for them, Tr. at 188:10-191:3, and bringing them food while they were recovering, *id.* at 191:4-17.   Finally, Petitioner contributed to the costs of childcare by helping to pay for the children's babysitter.  *See* Exh. P2C.  Once again, this degree of involvement exceeds the "fairly minimal activity on the part of a petitioner," *In re D.T.J.*, 956 F. Supp. 2d at 533, necessary to exercise rights of custody.

With all three elements under the Convention established, *see Gitter*, 396 F.3d at 130-31, the Court concludes that the children were wrongfully removed from the Dominican Republic for purposes of the Convention.  The Court now turns to Respondent's invocation of the affirmative defense allowed by Article 13(a).   Under the previously discussed burden-shifting scheme, Respondent must show that, despite the proof of Petitioner's exercise of rights of custody, he nonetheless was not exercising rights of custody at the time of removal.  Her primary argument to that effect is that Petitioner ceased to exercise his rights of custody during the months immediately prior to the children's removal from the Dominican Republic.  During that period, she argues, he did not visit them in person, he refused to communicate with them over telephone or video chat, and he refused to visit them in person by traveling from Santo Domingo, where he lived, to Santiago, where Respondent was living with the children.  *See* Dkt. 53 ("Respondent Brief") ¶ 4, at 7. The parties do not dispute those facts.  Petitioner did not see the children in person from late June or early July 2021 until their removal (and, indeed, has not seen them since).  Tr. at 68:20-70:5.  During that period, Petitioner acknowledged, he refused to travel to Santiago even though Respondent had said she would let him see the children there.  *Id.* at 85:2-22.   And when Respondent told him that she was willing to permit him to communicate with the children only via

21

telephone or video chat, he responded not by using those methods of communication but rather by telling her that her offer was "unacceptable." *Id.* at 69:6-9; *see also id.* at 88:10-15.

In some circumstances, a parent's cessation of communications or in-person visits with a child might suggest that he stopped exercising his rights of custody. But while Petitioner did not actually communicate with the children or see them in person after around late June 2021, the evidence at trial showed that he attempted to maintain contact with them in July and August 2021 before they left the Dominican Republic for the United States. Petitioner testified that after his final visit with the children in June 2021, he continued to ask Respondent to be allowed to visit the children in person, and that she did not allow him to do so. *Id.* at 72:13-21. Indeed, on one occasion when he was scheduled to have a visit with the children, he picked up Respondent from a grocery store and drove her home, only for Respondent not to let the children come out to see him while he waited for thirty minutes. *Id.* at 69:10-22. Throughout the children's final months in the Dominican Republic, Petitioner "kept sending [Respondent] messages saying, where are the kids" and "[wrote] to her telling her [that he] want[ed] to see the kids." *Id.* at 87:5-9. Furthermore, Respondent's own testimony confirmed that Petitioner continued to seek contact with the children after his final visit with them in June 2021: she acknowledged that Petitioner "repeatedly ask[ed] [her] that he wanted to physically see his children in person." *Id.* at 173:16-19. No evidence at trial suggested that these requests were insincere. Rather, Petitioner's frequent contact with the children from the separation until June 2021 strongly indicates that his attempts to continue interacting with them after June 2021 were genuine, particularly considering the aforementioned occasion when he drove to Respondent's home to see his children but Respondent refused to permit them to leave the house. *Id.* at 69:10-22. Moreover, Petitioner provided an understandable explanation at trial for why he decided not to interact with the children in the manner that

22

Responded decreed, *i.e.*, only by telephone or by video.  *Id.* at 69:6-8 ("[Respondent] kept telling me that the only access I would have with them . . . is video or phone conversation.  And I would say, that's unacceptable."); *id.* at 88:13-15 ("And I repeat, I cannot accept that ultimatum because I was involved in my kids' life since day one with no interruption.").  But he nonetheless did attempt to continue his interactions with the children up until their departure from the Dominican Republic.  Those attempts suffice for him to have actually exercised his rights of custody.[3]

In sum, the evidence clearly established that Petitioner did attempt to maintain regular contact with the children between June 2021 and their departure from the Dominican Republic in August 2021:  he repeatedly asked Respondent to allow him to visit them in person, and the Court concludes that he would have continued to maintain contact with them had those requests been granted.  Thus, although he did not visit them in person after June 2021, in these circumstances that fact does not reflect a failure to exercise rights of custody at the time of the removal.  Accordingly, Petitioner established at trial by a preponderance of the evidence that he was exercising rights of custody at the time the children were removed from the Dominican Republic.  Consequently, their removal was wrongful under Article 3 of the Convention.  Furthermore, because Respondent has not produced sufficient evidence to show that Petitioner "was not actually

---

[3] Although it does not appear that the Second Circuit has directly considered the applicability of the actual-exercise requirement to a petitioner's unsuccessful attempts to maintain contact with his children, other circuits have reached the logical conclusion that attempts to maintain contact suffice.  The Sixth Circuit has explained that "[a]lthough there may be situations when a long period of unexplainable neglect of the child could constitute non-exercise of otherwise valid custody rights under the Convention, as a general rule, any *attempt* to maintain a somewhat regular relationship with the child should constitute 'exercise.'"  *Friedman*, 78 F.3d at 1066 (emphasis added).  Similarly, the Third Circuit has held that a petitioner "can show the exercise of custody rights by demonstrating that he or she kept *or sought to keep*, some sort of regular contact with the child."  *Yang v. Tsui*, 499 F.3d 259, 277 (3d Cir. 2007) (emphasis added) (citation omitted).  And at least one court in this District has held the attempt to maintain contact with a child sufficient to show that a petitioner exercised rights of custody.  *See Velozny*, 550 F. Supp. 3d at 14 ("Petitioner continued to make attempts to visit and contact the children . . . .").

exercising the custody rights at the time of removal," the exception established by Article 13(a) of the Convention cannot apply.

## B.  Grave Risk

Respondent additionally has raised a defense under Article 13(b) of the Convention, which permits a court not to return a child if "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention art. 13(b).  The burden of establishing an Article 13(b) defense rests squarely on Respondent.  28 U.S.C. § 9003(e)(2)(A); Hague Convention art. 13.  Furthermore, as noted, an Article 13(b) defense must be proved by the heightened clear and convincing evidence standard. 28 U.S.C. § 9003(e)(2)(A).  Thus, Respondent can prevail on this defense only by showing that the grave risk to the children "is highly probable or reasonably certain." *Ragbir v. Holder*, 389 Fed. App'x 80, 84-85 (2d Cir. 2010) (quoting *Evidence*, Black's Law Dictionary (9th ed. 2009)). While Respondent does present some evidence in support of her Article 13(b) defense, that evidence is insufficient to show it highly probable or reasonably certain that returning the children would expose them to a grave risk of physical or psychological harm.  Consequently, Respondent has not shown that Article 13(b) permits this Court to decline to order the return of the children to the Dominican Republic.

As explained in the State Department's Legal Analysis of the Hague Convention, and as recognized by the Second Circuit, Article 13(b) "was not intended to be used by defendants as a vehicle to litigate (or relitigate) the child's best interests."  Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. at 10510, *cited in Diorinou v. Mezitis*, 237 F.3d 133, 145 (2d Cir. 2001).  Thus, the "grave risk exception is to be interpreted narrowly, lest it swallow the rule."  *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013) (citations and internal

quotation marks omitted).  The gravity of the risk must involve "not only the magnitude of the potential harm but also the probability that the harm will materialize." *Id.* (citation omitted).  To sustain the defense, then, "[t]he potential harm to the child must be severe, and the . . . level of risk and danger required to trigger this exception [must] be very high."  *Id* (citation and internal quotation marks omitted).  In particular, "a grave risk of harm from repatriation arises in two situations: (1) where returning the child means sending him to a zone of war, famine, or disease; or (2) in cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, *for whatever reason*, may be incapable or unwilling to give the child adequate protection."  *Id.* (citation and internal quotation marks omitted).

To sustain her defense, Respondent must identify the "severe" harm that the children will risk suffering if returned to the Dominican Republic, and she must present evidence to show that the likelihood of their suffering that harm is "very high."  Respondent's counsel argued at trial that returning the children to the Dominican Republic would risk exposing them to physical violence from Petitioner.  Tr. at 239:20-23.  Without doubt, violence directed at a child could qualify as a severe harm under Article 13(b).  *See Ermini v. Vittori*, 758 F.3d 153, 164-65 (2d Cir. 2014) (finding a "sustained pattern of physical abuse" on the part of a petitioner sufficient for an Article 13(b) defense).  The question, then, becomes whether Respondent has provided clear and convincing evidence of a grave risk that the children would be subject to physical violence from Petitioner if returned to the Dominican Republic.

The primary event Respondent cites as evidence of that risk is the incident of spousal violence, discussed *supra* at II.C, that she alleges took place while she was pregnant with A.F.E. As described, the incident was disturbing and abhorrent.  But even accepting Respondent's characterization as accurate, it would provide only weak evidence in support of an Article 13(b)

defense, however poorly the incident might otherwise reflect upon Petitioner.  For even if it demonstrates that Respondent might have faced a grave risk of further violence were she to have remained in a relationship with Petitioner, "[t]he Article 13(b) inquiry is not whether repatriation would place the respondent parent's safety at grave risk, but whether so doing would subject *the child* to a grave risk of physical or psychological harm." *Souratgar*, 720 F.3d at 104 (emphasis added).  That is, spousal violence bears on Respondent's Article 13(b) defense only to the extent that it identifies a grave risk of violence that the children would face if returned.  Certainly, spousal violence can sometimes support a finding that such a risk to the children exists if it "show[s] a sustained pattern of physical abuse and/or a propensity for violent abuse." *Id*. (internal quotation marks omitted).  But a single incident of violence does not suffice to demonstrate a sustained pattern of or propensity for abuse.  "[L]imited incidents aimed at persons other than the child, even if witnessed by the child, have not been found to constitute a grave risk." *Id.* (collecting cases).  Indeed, the Second Circuit has affirmed an order for a child's return despite evidence of repeated spousal violence, *id.* at 100, because given "the lack of any indicia of ill-will on the part of [the petitioner] toward [the child], and contrary credited evidence of a loving father-son relationship," the spousal violence was insufficient to establish a "clear and convincing showing in the record that the boy faces a grave risk of harm from his father," *id.*  at 106.  And if repeated spousal violence does not suffice for an Article 13(b) defense, then the single incident Respondent alleges cannot suffice either, especially when combined with the absence of any evidence that Petitioner ever abused the children and the ample evidence of his loving relationship with them.

To support her Article 13(b) defense, Respondent also points to the social gathering in Puerto Plata in 2017 that she, Petitioner, and M.G.E. attended, discussed *supra* at II.A.2.  Respondent Brief ¶ 6, at 8.  At that gathering, some friends of Petitioner's were smoking marijuana,

causing Respondent to feel unsafe and ultimately to leave with M.G.E.  Subsequently, she was forced to make her way home by herself via taxi and public transportation, despite having very little cash on her.  *See* Tr. at 122:20-126:10.  Petitioner's conduct on this occasion, while perhaps not exemplary, does not amount to clear and convincing evidence that returning the children would expose them to a grave risk of physical or psychological harm.  An Article 13(b) defense may succeed based on the risk that a petitioner himself will cause harm "in cases of serious abuse or neglect."  *Souratgar*, 720 F.3d at 103 (citation and internal quotation marks omitted).  In some circumstances, exposing children to illegal drugs could constitute that sort of serious neglect.  But the evidence presented by Respondent falls far short of that level.  Over a multiple-year parental relationship, a single incident of Petitioner's friends smoking marijuana at a gathering with his family (and outside the presence of his child) does not amount to a "very high" likelihood that Petitioner would expose the children to similar environments in the future, particularly where Petitioner testified that he did not know his friends were going to smoke marijuana.  Tr. at 96:3-5; *see Souratgar*, 720 F.3d at 103 (specifying that "the level of risk and danger" must "be very high" (citation, brackets, and internal quotation marks omitted)).  Furthermore, while exposure to drugs might in some circumstances constitute a "severe" harm, *see id.* ("The potential harm to the child must be severe . . . ."), during the Puerto Plata incident M.G.E. remained with his mother in a room while the marijuana use occurred outdoors.  Tr. at 96:10-14.  Given M.G.E.'s physical separation from the marijuana use, and the absence of any other occasion on which similar events occurred, the Puerta Plata incident does not rise to the level of "serious neglect" required for an Article 13(b) defense under the Convention.

Next, Respondent argues that Petitioner's refusal to contact the children via telephone or video chat after they were removed from the Dominican Republic justifies a finding that returning

them would create a grave risk, because his failure to contact the children demonstrates his lack of empathy for them and disregard for their wellbeing. *Id.* at 240:11-14, 18-24. For reasons discussed above, the Court does not find that this period without communication reflected any disregard by Petitioner for his children's wellbeing. But even if it did, to prevail under Article 13(b), a respondent must show a very high likelihood that returning the children will subject them to a severe harm, not merely identify some respect in which the petitioner disregarded their welfare. Respondent has identified neither why Petitioner's refusal to contact the children by telephone or video shows that returning them to the Dominican Republic would be highly likely to subject them to a severe harm, nor has she even identified what severe harm that would be.[4] Consequently, that refusal cannot sustain Respondent's Article 13(b) defense.

The remaining evidence Respondent advances to sustain her Article 13(b) defense largely concerns Petitioner's treatment of her during their marriage. Respondent testified that Petitioner misinformed her about the number of children he had and about the nature of his relationships with some of them, Tr. at 110:9-14, 110:23-111:15; he began drinking during the marriage, *id.* at 112:15-16, 134:7, 197:20-21; he would not let her visit her family for the holidays, *id.* at 114:20-115:2; he misled her about his faith, *id.* at 115:3-9; he was unfaithful to her after she gave birth to M.G.E., *id.* at 120:17-121:6; he verbally abused her, *id.* at 129:1-3, 193:2-8, 193:15-24; he used

---

[4] At one point, Respondent's counsel appeared to suggest that Petitioner's refusal to contact the children itself constitutes a psychological harm within the meaning of Article 13(b). Tr. at 241:22-24. But regardless of whether their father's absence can plausibly be considered a severe harm, Article 13(b) requires there to be "a grave risk that *his or her return* would expose the child to physical or psychological harm." Hague Convention art. 13(b) (emphasis added). Thus, a defense under Article 13(b) must identify a severe harm that the child would suffer *as a result of being returned*. Whatever harm the children may suffer from their lack of contact with their father, they are already suffering it now and thus it could not be caused by their return to the Dominican Republic. Indeed, since Petitioner presumably would resume contact with the children were they returned to the Dominican Republic, their return would, if anything, ameliorate this harm.

his control of the family's finances to control her, *id.* at 128:21-25; 196:5-25; and he argued with her in public around the couple's friends, *id.* at 205:6-206:6.  As a result, both Respondent and her witnesses testified that she was depressed and unhappy in the marriage.  *Id.* at 127:19-128-7, 207:22-208-10, 219:18-21.  Respondent's portrayal of the relationship certainly suggests that she and Petitioner were poorly suited for one another.  But Article 13(b) does not establish an exception to return based on the relationship between the parents; rather, it permits children not to be returned only when there is a grave risk of harm *to the children*.  Thus, the reasons for the breakdown of the parties' marriage are not relevant to the Article 13(b) analysis unless they establish a very high likelihood that the children will suffer a severe harm if they are returned.  And while this evidence may establish Petitioner's unsuitability to be married to Respondent, Respondent has advanced no argument for why it shows that the children will likely suffer harm if they are returned to the Dominican Republic.

Ultimately, then, Respondent has not succeeded in establishing, by clear and convincing evidence, the grave risk that returning the children would expose them to physical or psychological harm or otherwise place them in an intolerable situation.  *See* Hague Convention art. 13(b).  Thus, the exception established in Article 13(b) does not apply in this case, and this Court cannot on that basis decline to order the children's return to the Dominican Republic.

## IV. Conclusion

Without question, underlying this case is a complex and difficult dispute over the proper upbringing for M.G.E. and A.F.E.  As the bench trial made clear, Petitioner and Respondent are not compatible with one another and are ill suited to raise children together.  It also made clear, however, that they each love their children and wish the best for them, though they may disagree about what that would be.  But resolving that tremendously challenging dispute is not the task

before this Court.  A petition under the Hague Convention presents a much narrower question: whether the children have been wrongfully removed within the meaning of Article 3, and, if so, whether any exception under the Convention nonetheless permits them to be retained.  And in answering those questions, the Court's inquiry is strictly circumscribed:  the Convention requires return if a limited number of conditions are met and does not permit a court to adjudicate a petition for return based on its view of the broader custody dispute between the parties.

In this case, those conditions are plainly met.  Petitioner has shown that the children were habitually resident in the Dominican Republic before their removal; that their removal was inconsistent with his rights of custody under Dominican law; and that he was exercising those rights before the removal.  Furthermore, Respondent has not defeated Petitioner's showing that he was exercising those rights, and she has not shown by clear and convincing evidence that returning the children would expose them to a grave risk of physical or psychological harm or otherwise place them in an intolerable situation.  Consequently, the Court orders the children to be returned. Once again, this Order does not convey any judgment about the underlying merits of the custody dispute, and it is not intended to deprecate Respondent's desire to raise the children in the United States.  Rather, those custodial questions must be resolved by the family courts of the Dominican Republic, which the Convention designates as the proper forum for their resolution.

For the foregoing reasons, Respondent is ordered to return the children to the Dominican Republic by November 7, 2022.  The Court is currently in possession of passports for Respondent and the children.  *See* Dkt. 10.  The passports will be released to Respondent to facilitate her travel with the children to the Dominican Republic.  The children may not be removed from the State of New York prior to their return to the Dominican Republic.

Petitioner must file any request for the payment of his necessary expenses incurred in connection with this action no later than October 31, 2022.  In the event Petitioner seeks legal fees, such a request must include contemporaneous bill statements and an affidavit establishing the hourly rates sought.  The request also must contain a detailed explanation of how each expense for which payment is sought was necessarily incurred on behalf of this action.  Respondent must file any objections to Petitioner's requests by November 14, 2022.

SO ORDERED.

Dated: October 17, 2022
       New York, New York

_____
JOHN P. CRONAN
United States District Judge